WARREN METLITZKY (CA Bar No. 220758)
WILLIAM J. COOPER (CA Bar No. 304524)
**CONRAD | METLITZKY | KANE LLP**
Four Embarcadero Center, Suite 1400
San Francisco, CA  94111
Tel:    (415) 343-7100
Fax:    (415) 343-7101
Email: wmetlitzky@conmetkane.com
Email: wcooper@conmetkane.com

JENNIFER SELENDY (*pro hac vice forthcoming*)
SEAN BALDWIN (*pro hac vice forthcoming*)
MARGARET LARKIN (*pro hac vice forthcoming*)
DAVID COON (*pro hac vice forthcoming*)
**SELENDY & GAY PLLC**
1290 Avenue of the Americas
New York, NY  10104
Tel:    (212) 390-9000
Fax:    (212) 390-9399
Email: jselendy@selendygay.com
Email: sbaldwin@selendygay.com
Email: mlarkin@selendygay.com
Email: dcoon@selendygay.com

*Attorneys for Plaintiff Gwen Campbell*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| GWEN CAMPBELL, | CASE NO. 3:21-CV-9309 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| J.P. MORGAN SECURITIES LLC, JPMORGAN CHASE BANK, N.A., | |
| Defendants. | |

Plaintiff Gwen Campbell, through her attorneys, Conrad | Metlitzky | Kane LLP and Selendy & Gay PLLC, for her complaint against J.P. Morgan Securities LLC and JPMorgan Chase Bank, N.A., alleges as follows:

## NATURE OF ACTION

1. This action arises from the ongoing efforts by J.P. Morgan Private Bank (the "Private Bank") to poach Plaintiff Gwen Campbell's relationships with her financial advisory clients following her move from Merrill Lynch to J.P. Morgan Advisors ("J.P. Morgan" or "JPMA") in October 2020.[1]  After J.P. Morgan aggressively recruited Campbell and persuaded her to move her clients with explicit contractual promises they would not be poached by other groups at the bank, the Private Bank began ruthlessly soliciting her clients, disparaging her, and preventing clients from sending assets to Campbell (and redirecting them to the Private Bank) without her consent.  In recent weeks, the Private Bank has significantly escalated its attacks on Campbell's client relationships and thwarted her ability to execute client transactions while, after months of promising to make things right, Campbell's superiors at J.P. Morgan have conceded that they are powerless to help.  As a result of the misrepresentations and breaches by J.P. Morgan, Campbell is suffering irreparable harm to her business, her reputation, and the client goodwill that has taken her decades to build.  This is exactly the type of harm to client relationships and reputation that Campbell's employment agreement—drafted by J.P. Morgan—explicitly acknowledges "causes immediate and irreparable injury" that "cannot be adequately remedied by monetary damages."

2. Campbell joined J.P. Morgan in October 2020 after a nationally recognized and award-winning career at several Wall Street institutions, most recently as one of Merrill Lynch's top-producing financial advisors with high-profile clients and over $1.1 billion in assets under management ("AUM").  J.P. Morgan—which viewed Campbell's robust book of business as a potential jewel in its burgeoning financial advisory business—aggressively recruited Campbell to join its team.  Among many other promises made to induce Campbell to join, J.P. Morgan promised that her clients would remain her clients and that she would not be undermined or distracted by "channel conflicts" caused by other divisions of

---

[1] Campbell is employed by J.P. Morgan Securities LLC ("JPMS"), doing business as J.P. Morgan Advisors.  J.P. Morgan Securities LLC was formerly the financial advisory arm of Bear Sterns & Co.  J.P. Morgan acquired Bear Stearns during the financial crisis in March 2008.

the bank competing against her for her many trophy clients.  Campbell wanted to protect her clients from this distraction and being pulled into conflicts.  Campbell is paid on commission (*i.e.*, a percentage of the revenues she generates for the firm), and her success and industry standing are directly measured by the revenues she generates and the assets and loans she manages and oversees for her clients.

3.    Based on these promises, Campbell agreed to move to J.P. Morgan, prompting one of her billionaire clients—a self-proclaimed "tough grader"—to email JPMorgan Chase CEO Jamie Dimon to congratulate him on hiring "a winner" who had successfully managed his assets for decades.  But despite the fact that Campbell's move to JPMA was a spectacular success, bringing nearly $1.1 billion in assets and another $270 million in loans to the firm's lagging financial advisory business, J.P. Morgan has not fulfilled its contractual obligations to Campbell.  Instead, Campbell is a victim of a hire-and-poach "Playbook" that is known within J.P. Morgan to be a consequence of the internal conflict between JPMA and the Private Bank.  Instead of the "One Firm" culture Campbell was promised, she has been lured into a shark tank in which Private Bank employees defame her to her own clients and attempt to poach client assets from Campbell's management without consideration for, and often contrary to, the clients' best interests.  Just last week, Campbell was told by a Managing Director in the Investment Banking Division of J.P. Morgan that she could not get a loan approved for a billionaire client because she is a financial advisor caught in an "internal war" between JPMA and the Private Bank over high-net-worth clients.

4.    What's worse, Campbell is now trapped.  She would never have agreed to leave her enviable position at Merrill Lynch without the contractual commitments and promises J.P. Morgan made to her.  As an immunocompromised single mother raising two children with disabilities during a global pandemic, Campbell cannot possibly make another move just one year after arriving at JPMA, so her entire professional life is now at risk.  Unbeknownst to Campbell before her arrival at the firm, J.P. Morgan has a history, including with other star female advisors, of hiring financial advisors and shackling them to the firm with long-term forgivable loans and deferred compensation before blatantly poaching their clients.  In fact, Campbell has learned that rumors of her status as a "star recruit" circulated within JPMA in the weeks before her arrival, leading one of the financial advisors there to lament to Campbell's soon-to-be supervisor, Steve McCashin: "I can't believe you're bringing [Campbell] into this place knowing what you know about how businesses are stolen" from financial advisors at J.P. Morgan.

5.      In the last few weeks, following months of secretive and illegal poaching activity on the part of the Private Bank, Campbell has learned that assets under her management are being seized, moved to accounts outside her care, and mismanaged as part of a concerted plan to poach one of her most high-profile clients, a former professional athlete.  Her client's requests that Campbell remain in charge of his accounts have been ignored.  Although Campbell has sought redress through all appropriate internal channels, she was repeatedly asked for patience and forbearance while Phil Sieg, JPMA's CEO, promised to "fix" the misconduct at the Private Bank.  Yet on October 27, 2021, Sieg finally flew to the West Coast to meet with Campbell, only to reveal that he was utterly unwilling or incapable of stopping the Private Bank from depriving Campbell of the benefit of her contract.

6.      Meanwhile, as Campbell learns sporadically from other clients that she is being disparaged and undermined, she has no way of knowing how extensive the Private Bank's efforts to poach her clients actually are.  The only reason she knows what she knows is because several loyal clients have reported on the efforts of the Private Bank to persuade them to stop working with Campbell.  Given the Private Bank's repeated efforts to solicit and poach Campbell's client relationships to date, she has every reason to believe that her other clients are being, and will continue to be, solicited and poached by members of the Private Bank absent injunctive relief.  The harm to Campbell's business, including her reputation and goodwill, is incalculable and cannot be adequately remedied by money damages alone—as is expressly acknowledged in Campbell's employment agreement.  The future value of bespoke client relationships, cultivated over decades, is impossible to calculate, as is the harm to her reputation caused by disparagement.

7.      Beyond the secret solicitations, J.P. Morgan has left Campbell without reliable access to the firm's technological systems for months.  Under her contract, the Americans with Disabilities Act ("ADA"), and California's Fair Employment and Housing Act ("FEHA"), Campbell secured an accommodation to work from home throughout the COVID-19 pandemic because she and her son are both severely immunocompromised, requiring monthly blood transfusions.  For months, she has been promised access and for months, JPMA has failed to deliver.  No amount of begging JPMA's IT staff or senior management for a solution has proved effective.

8.      In light of Defendants' serious misconduct, Campbell will file in the near future an arbitration proceeding pursuant to the mandatory arbitration provision included in her employment contract.  In that proceeding, Campbell brings claims including breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, defamation, violation of California labor law, failure to provide a reasonable accommodation, and gender discrimination and retaliation. Campbell is likely to succeed on the merits of these claims given J.P. Morgan's flagrant disregard of her contract.  However, because the Private Bank's efforts to poach Campbell's clients and damage her client relationships are ongoing and cannot be remedied by money damages alone, and because her business continues to be damaged by J.P. Morgan's denial of adequate remote access to accommodate her medical condition during a global pandemic, Campbell requires prompt injunctive relief to maintain the status quo until her rights are finally adjudicated in arbitration.

9.      Accordingly, to maintain the status quo pending resolution of Campbell's claims in arbitration, Campbell seeks a temporary restraining order and preliminary injunction restraining Defendants from the following conduct until such time as the Parties' rights are resolved in the arbitration:

a.      Soliciting, calling, or meeting with Campbell's clients who were not also clients of the Private Bank as of October 2020 on behalf of or for the benefit of the Private Bank without Campbell's agreement, except to the extent required by law;

b.      Seeking to expand the Private Bank's relationship with any Campbell client that was a "shared client" as of October 2020 by offering any product or service that the Private Bank did not already provide such client as of October 2021 without Campbell's agreement;

c.      Transferring any client assets from Campbell's care without Campbell's knowledge and client consent;

d.      Disparaging Campbell when speaking to any clients serviced by Campbell; and

e.      Interfering with Campbell's ability to service her clients by denying Campbell a reasonable work-from-home accommodation.

## **THE PARTIES**

10.     Plaintiff Gwen Campbell is a California resident employed by J.P. Morgan Securities LLC as a registered financial advisor based in its San Francisco, California office.

- 4 -

11.     Defendant J.P. Morgan Securities LLC is a Delaware limited liability company with its principal place of business in New York, New York.  JPMS operates a financial advisory business doing business as J.P. Morgan Advisors, which offers investment products and services to consumers.

12.     Defendant JPMorgan Chase Bank, N.A. is an Ohio corporation with its principal place of business in Columbus, Ohio.  JPMorgan Chase Bank, N.A. provides investment and banking services to consumers, including through its division J.P. Morgan Private Bank.

## JURISDICTION AND VENUE

13.     This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds $75,000, exclusive of interest and costs, and this action is between citizens of different States.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial number of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## DIVISIONAL ASSIGNMENT

15.     This action is properly assigned to this Court's San Francisco division pursuant to Local Rule 3-2(c)–(d) because a substantial number of the events or omissions giving rise to the action occurred in the County of San Francisco.

## FACTUAL ALLEGATIONS

**I.      Gwen Campbell Builds a Nationally Recognized Investment Advisory Business, Managing Over $1.1 Billion of Assets for Marquee Clients**

16.     Financial advisors like Campbell provide brokerage and investment advisory services typically to high-net-worth clients whose assets are managed under the financial advisor's care.  Financial advisors also advise clients regarding lending and provide them access to all types of loans and mortgages.  There is fierce competition among banks for financial advisors with portable books of business, and aggressive recruiting is a standard practice among financial firms because they realize selective recruiting of advisors with established books of business is more effective than training advisors from their own ranks.  This is mostly due to the difficulty of gaining the trust and confidence of sophisticated, high-net-worth clients.  Indeed, industry participants have noted that "[i]t's very difficult to mint the prototypical

advisor from scratch these days."[2]  Firms typically pay advisors a percentage of the overall revenue from their book, in addition to offering back-end bonuses for moving assets and revenues to their new firm. Advisors also receive retirement plans to incentivize them to keep their clients at the firm.

17.     Firms also recruit successful financial advisors as a part of their intensely competitive fight for high-profile clients.  So-called "trophy clients" are considered valuable not only for their assets, but also—and even more so—for the name recognition and credibility they bring to a firm.  Firms therefore aggressively pursue these high-profile clients in order to use their fame and notoriety to enhance the bank's brand and to tap into their networks of other high-profile and high-net-worth individuals.

18.     Over the past 30 years, Campbell has worked to earn the trust and respect of some of the country's most powerful and well-known individuals, who rely on her for advice on the most intimate and important aspects of their financial lives.  Campbell was drawn to financial advisory work because the metrics of success with her clients and her firm were objective and indisputable, and she rose to become one of the top financial advisors in the country.  By 2020, Campbell managed over $1.1 billion of client assets.  She counts among her clients sports legends, company founders, and famous authors, who have publicly praised her for her advocacy, understanding of their financial needs, and ability to leverage the resources of a financial firm to help them.  Her success advising entrepreneurs and financiers has earned her national recognition for her work on behalf of clients, landing her spots on *Barron's* list of the nation's Top 100 Women Financial Advisors, the *Financial Times* list of Top 400 Financial Advisors in America, and the *Forbes* 2020 list of Top Women Advisors in the nation and in California.[3]  As an immuno-compromised single mother of two, Campbell has also been recognized on the Working Mother list of Top Wealth Advisor Moms.[4]

---

[2] Miriam Rozen & Mason Braswell, *Exclusive: Merrill Strips Trainees of Their Client Books*, ADVISORHUB (Sept. 30, 2021), https://www.advisorhub.com/exclusive-merrill-strips-trainees-of-their-client-books/.

[3] *See, e.g.*, Suzanne McGee, *To Each Her Own*, BARRON'S (June 11, 2007, 11:59 PM), https://www.barrons.com/articles/SB118076673967422568?tesla=y; Loren Fox, *The FT 400 Top Financial Advisers*, FINANCIAL TIMES (Apr. 16, 2020), https://www.ft.com/content/ddb3b6e0-78bd-11ea-9840-1b8019d9a987; *Profile: Gwen Campbell*, FORBES, https://www.forbes.com/profile/gwen-campbell/?sh=78e94166412e (last visited Nov. 29, 2021).

[4] Quinn Fish, *Top Wealth Advisor Moms 2020*, WORKING MOTHER & SHOOK Research (2020), https://www.workingmother.com/sites/workingmother.com/files/attachments/2020/09/wmm1120_shook_no_profiles_no_timeline.pdf.

- 6 -

19.     It was a long road to success.  After graduating from the University of Pennsylvania with a dual degree and Phi Beta Kappa honors, Campbell started her career at Goldman Sachs ("Goldman") and returned to Goldman after finishing her M.B.A. at Harvard Business School.  It was when she returned to Goldman from Harvard in 1997 that she decided to become a financial advisor.  She also wanted to work in a field where she did not have to depend on referrals from the firm but could rise on her own merit and be judged on metrics that were objective.  Campbell was successful at Goldman in that she became "self-sustaining" and moved to a primarily commission-based compensation plan.[5]

20.     Despite thirteen years of success at Goldman, Campbell wanted to get away from the "home cooking" approach Goldman took to the advisory business, which prioritized offering Goldman-sponsored financial products to clients.  Campbell wanted the ability to offer clients a more "open platform," where she could access the best-of-the-best outside fund managers and face fewer incentives to sell only products sponsored by the firm.  In 2004, Campbell joined UBS as a Senior Vice President, where she continued to advise clients on wealth management and was permitted to offer a broader variety of products tailored, first and foremost, to the interests of her clients.

21.     At UBS, Campbell built her business to nearly $900 million in assets.  This success caught the attention of media outlets who touted Campbell as a top female financial advisor, with publications like *Barron's* profiling her in an article titled "To Each Her Own."[6]  Financial firms across the country also took notice and made overtures to recruit Campbell to join their ranks with her highly valuable book of business in tow.

22.     In 2007, Campbell became pregnant with her first child.  Unfortunately for Campbell, UBS did not offer any maternity leave without tying it to disability leave.  Campbell was presented with a

---

[5] A financial advisor is considered "self-sustaining" when the advisor opts out of receiving a set salary in exchange for a commission-based compensation scheme.  A commission-based financial advisor's income is generally contingent on the financial products they sell to clients and the amount of client AUM.  For example, when a client purchases a product recommended by the advisor, like a mutual fund, stock, or other asset, the advisor is paid a percentage of the advisory fee, rising to as high as 50% in some cases.  Additionally, if an advisor successfully negotiates a loan between a client and the advisor's financial institution, the advisor is typically paid some percentage of the interest.  Not only are financial advisors compensated based on the investments they make or products they sell to clients, but they are also ranked and given awards by industry publications and trade groups based on their AUM and the revenue they have generated from managing client assets over a trailing twelve-month period.

[6] Fox, *supra* note 3.

CASE NO. 21-9309                                                                                          COMPLAINT

1  choice: either take four total days of sick leave to have her first child, or take disability leave and file a

2  disability claim with the State of California.  Campbell would have to abandon her clients during the

3  "disability," and would not be permitted to talk to or send a single email for the entirety of a six-week

4  period.  Under the disability leave policy, if she had tried to talk to clients, she was told she would be

5  fired.  Campbell thus had no choice but to change firms in the middle of the Financial Crisis of 2008 and

6  the subsequent Great Recession, at tremendous professional cost and with a young infant in tow.  In mid-

7  2008, Campbell joined Merrill Lynch as a Managing Director, in the elite Private Banking and Investment

8  Group, because she liked the people and client-focused culture.

9        23.     Approximately three weeks after Campbell joined, Merrill Lynch collapsed and was sold

10  to Bank of America.  Clients had agreed to move to Merrill Lynch with her, but the collapse of the firm

11  and global economic events crushed Campbell's planned client transition.  As reported by the press, "[t]he

12  humbling move[], which reshape[d] the landscape of American finance, mark[ed] the latest chapter in a

13  tumultuous year in which once-proud financial institutions have been brought to their knees."[7]  It took

14  years for Campbell to rebuild her business.  Eventually, however, most of Campbell's clients returned to

15  her, and her book of business grew even further to more than $1 billion.  During her twelve years at Merrill

16  Lynch, Campbell rose through the ranks, earning the respect and admiration of the firm's senior

17  management.  She was invited by the Head of Wealth Management, John Thiel, to join the Advisory

18  Council to Management, a senior management group of the top advisors nationwide who worked

19  collaboratively with the management team to improve Merrill Lynch's Wealth Management business.

20  She flew back and forth to New York because she loved the camaraderie with her peer advisors, helping

21  the firm, and collaborating with the management team to make the firm better.  Campbell served for almost

22  three years in this position.

23        24.     At Goldman, UBS, and Merrill Lynch, Campbell's success meant that she was able to

24  leverage each firm's reputation, vast array of resources, and technical and wide-ranging financial expertise

25  to meet the range of needs typical of high and ultra-high-net-worth family offices.  Campbell's success,

26  collaborative approach, and hard work meant that the heads of other business groups within her institution

27

28  _____

[7] Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill is Sold*, N.Y. TIMES (Sept. 14, 2008), https://www.nytimes.com/2008/09/15/business/15lehman.html.

CASE NO. 21-9309                                                                                          COMPLAINT

knew that her clients respected her, and they were ready to lend support to her clients.  Without this kind of support, Campbell would have been unable to serve her clients or gain their trust and confidence.

25.     This kind of support was especially crucial given the many roles expected from a financial advisor.  A financial advisor is meant to be in the center of all of a firm's resources, accessing and leveraging other areas of the firm to help their clients.  In large firms, financial advisors are dependent on working with other product teams to help connect clients with the resources they need to manage their wealth, including investment management ideas, asset allocation, intellectual capital, trading, and especially lending.  Campbell was very successful at working with other teams in Merrill Lynch and, during her time there, was recognized for collaboration on a wide range of lending products and services.  As a result of such collaboration, Campbell received compensation for bringing in new business for initial public offerings, corporate commercial loans, airplane loans, currency and treasury management, and many other types of lending and asset management.  Campbell thus knew how to deliver a "One Firm" experience for clients.

## II.     J.P. Morgan Aggressively Recruits Campbell to Join the Firm

26.     By 2019, Campbell was managing over $1.1 billion in assets for dozens of high-profile clients.  She continued to gain public recognition by speaking at conferences[8] and awards forums.  Her "A-list" client base also became a strong source of referrals and Campbell's book of business continued to grow.

27.     On numerous occasions, representatives of JPMA invited Campbell to join the firm's ranks and bring along her highly valuable book of business.  But despite the lure of increased compensation offered by J.P. Morgan, Campbell was reluctant at first to consider another move.  From experience, she was naturally concerned about asking her clients to move their accounts and, at least initially, also worried about J.P. Morgan's motives.  Campbell understood that J.P. Morgan was interested in acquiring her

---

[8] For example, Forbes and SHOOK invited Campbell to speak at its February 2020 Top Advisor Summit, where she addressed a conference of over 1,000 advisors.

network of powerful clients in the hope that it would attract more high-profile clients and help J.P. Morgan expand its financial advisory business.[9]

28.     Campbell eventually agreed to meet with various J.P. Morgan representatives to hear them out.  She learned early on in these discussions that J.P. Morgan was planning a substantial expansion of its advisory business—an area where the firm lagged substantially behind competitors like UBS, Morgan Stanley, and Bank of America.  Campbell was positioned as an industry leader who, according to J.P. Morgan, would be instrumental in attracting other successful financial advisors to join a new and exciting business expansion that was supported at the highest level of the firm.  At this point in her career, Campbell knew she could only move one more time.  There was the professional risk of persuading clients to follow, not to mention the substantial challenge of transferring over 400 accounts held by more than 40 clients if they did agree to move.  Campbell understood these risks well, having switched firms on two prior occasions, including once during the Financial Crisis.

29.     Campbell's main concern was the potential overlap of her existing clients with other divisions of J.P. Morgan.  This overlap can lead to conflicts, known within the industry as "channel conflicts"—*i.e.*, internal disputes between individuals and business units at the same financial institution over the control of, and profits from, client relationships.  She knew from her top clients that they did not have significant money management ties to J.P. Morgan.  She also knew, however, that these clients would never want to be drawn into time-consuming internal disputes when they had already long trusted her to manage their finances.

30.     Campbell was not seriously concerned that her clients would prefer another financial advisor or private banker, but exposing them to channel conflicts would be a red flag that the house of J.P. Morgan was dysfunctional and internal conflict would compromise her ability to continue to bring the absolute highest level of service to her clients.  She had built her reputation and her relationship of trust

---

[9] Executives at J.P. Morgan have made a concerted effort to maintain relationships with high-profile clients perceived as influencers, even when doing so posed substantial reputational risk.  In 2019, several news outlets reported that Mary Erdoes—one of J.P. Morgan's highest-ranking executives—refused to follow J.P. Morgan compliance officers' recommendation to cut ties with Jeffrey Epstein after he was charged with sex crimes, due to the vast and wealthy referral network he brought to J.P. Morgan. *See* Emily Flitter & Jessica Silver-Greenberg, *JPMorgan Kept Jeffrey Epstein as a Client Despite Internal Warnings*, N.Y. TIMES (Aug. 8, 2019), https://www.nytimes.com/2019/08/08/business/jeffrey-epstein-jpmorgan.html.

- 10 -

with clients over 25 years based on this level of service and Campbell did not want these close client relationships to be harmed by political infighting in a large firm.

31.     Ultimately, if Campbell's move to J.P. Morgan was unsuccessful, she would not only lose financially, but she would also lose 40 families who trusted her and about whom she cares deeply.  The clients were relying on her to make a good choice, and she did not want to let them down.

32.     Campbell was particularly wary of potential channel conflicts involving the Private Bank. The Private Bank offers many services that overlap with services offered by JPMA advisors, including lending and investment advisory services for high-net-worth clients.  And because of the different compensation structures for financial advisors and private bankers at J.P. Morgan, there are organizational incentives to shift client assets from under the management of JPMA advisors to the Private Bank. Financial advisors, who spend years cultivating relationships and building trust and goodwill with their clients, receive commissions or shares of the revenues based on the financial products that they sell or transactions they arrange for their clients.  Private bankers, however, are not expected to generate their own business from scratch and therefore are paid less, receiving salaries plus bonuses that can be impacted by bringing business into the Private Bank.  In addition, as J.P. Morgan's San Francisco Regional Director and Campbell's direct manager Steve McCashin told Campbell after she arrived at J.P. Morgan, individual private bankers are often fueled by the prestige and power within the firm of having "ownership" over relationships with high-profile individuals.  Thus, Campbell sought explicit assurances from senior management at J.P. Morgan that the other divisions within the firm, particularly the Private Bank, would not compete for the client relationships she had invested so much time and effort in building.

### III.     J.P. Morgan Makes Explicit Promises to Induce Campbell to Join

33.     Campbell agreed to pursue serious discussions with J.P. Morgan only after being assured that her concerns could be addressed through explicit provisions in her contract.  As discussions progressed, J.P. Morgan executives, including Chris Harvey, then-Chief Executive Officer ("CEO") of JPMA, and McCashin, told Campbell that moving her business to J.P. Morgan would give her access to additional resources, staff, and growth opportunities, while also helping to establish credibility for a

planned elite team of advisors in J.P. Morgan's newly-formed financial advisor group.[10]  She was also repeatedly told that her clients would have full access to all the resources and expertise the firm had to offer, including lending, which was a significant part of her business.  The firm did an excellent job per-suading Campbell that she and her clients would be treated with the utmost care and respect at JPMA.

34.     J.P. Morgan also presented Campbell with a financial offer that was both high-risk and high-reward.  At the outset, she would take an approximately fifty-percent pay cut from her salary at Merrill Lynch—a risky move for a single mom of two children, both of whom have special needs.  At the same time, J.P. Morgan offered to help her grow her business with the strength of its vast resources, broad reach, and powerful brand.  If she successfully moved her full book of business with her, she would earn a fifty-percent pay increase, plus back-end bonuses.  Campbell viewed this as a win-win for her and her clients: she had the opportunity to expand her support team to better service existing clients and to take on additional clients, and her clients would benefit from J.P. Morgan's powerful brand and vast resources.

35.     At the time she was considering the move, Campbell had a thriving business at Merrill Lynch, which was growing at a rate of 20–30% each year, and a retirement package based on 180–200% of her annual revenues, which would fully vest after two more years because of her long tenure at the firm.  In meetings, Campbell told J.P. Morgan that growing her business, including by being able to expand her portfolio of client loans, and maintaining control over her clients' assets were critical conditions for any move.  Harvey responded with promises to expand her team and help ensure her business would grow at an even faster rate with the unique positioning and support that would be offered by J.P. Morgan.

36.     J.P. Morgan set up a series of meetings orchestrated to convince her to make the move.  Specifically, McCashin, who was heavily involved in recruiting Campbell, arranged a set of all-day meetings in New York on July 8, 2019, with various members of J.P. Morgan Securities senior management, including Harvey; Kevin Casey, Head of National Sales and Field Leadership; Ed Bradley, Chief Administrative Officer; and Dan Ryan, a Market Director Vice President.  Because lending was of particular importance to her business, Campbell also asked to meet with George Epstein, the Head of Banking and Lending at J.P. Morgan Wealth Management, who assured her that she would have full

---

[10] Elizabeth Dilts Marshall, *JPMorgan to Hire More Than 500 Wealth Management Advisers*, REUTERS (July 22, 2021, 6:03 PM), https://www.reuters.com/article/jp-morgan-advisers-recruiting/jpmorgan-to-hire-more-than-500-wealth-management-advisers-idUSL1N2OY2I2.

access to the same platform and lending capabilities as other divisions in the firm. Epstein promised top-notch service for Campbell's clients. Most importantly, she met with David Frame—the current CEO of the Private Bank—to address her concerns about any channel conflicts with the Private Bank over her existing clients. In this meeting, Frame made explicit assurances to induce Campbell to join J.P. Morgan, including that she would maintain control of her client accounts and relationships and would not face competition from the Private Bank.

37.     McCashin also made various promises to Campbell. He assured her that she would be able to secure lending for her clients at a rate of LIBOR[11] plus 75 basis points, the same rate that she had always offered to her clients at Merrill Lynch. McCashin also expressly promised Campbell that she would not face internal competition for clients that she brought with her. Specifically, he explained that the firm had established and recently revamped a special committee to resolve all such conflicts in the best interest of clients. McCashin himself sat on the committee and talked to her about its effectiveness in preventing and resolving any disputes that arose within the firm over clients.

38.     After Campbell's meetings in New York, Harvey told her how excited J.P. Morgan was to have her join the firm, emphasizing his belief that Campbell was the "full package": someone who was both a cultural fit and a business fit for J.P. Morgan. Given how well the meetings in New York had gone, Harvey told Campbell that the next step would be to provide her with the financial terms of an employment offer.

39.     J.P. Morgan quickly made a financial offer to Campbell after her July 2019 meetings, but it took nearly a year of additional negotiations and assurances to finally persuade her to join the firm. In considering the offer, Campbell made sure to do her due diligence. She still had unresolved concerns, including the complications from moving that might arise due to the health problems of her and her son. Beginning in early 2020, her family's medical conditions severely limited her mobility because of the COVID-19 pandemic. As Campbell discussed with J.P. Morgan, her son requires frequent blood transfusions and full-time home schooling, and her daughter is hearing-impaired. Campbell also needed reasonable accommodations for her own health conditions, including approval to work from home and an

---

[11] The London Interbank Offered Rate ("LIBOR") is a commonly used benchmark interest rate.

adequate home technology setup so that she could work with her team to maintain the high level of service her clients expect.  She sought and received assurances that she would have 24/7 access to client accounts from her home office.  To entice her to join, J.P. Morgan promised in her contract that she could work from home, promised her a home office setup, and offered to reduce her workload for the enormous administrative tasks associated with transferring client accounts to J.P. Morgan through a transition-support team.

40.     All told, J.P. Morgan put together a compelling bundle of promises for Campbell to lure her to join the company, the most important of which were memorialized in her contract.  Executives Campbell spoke with assured her that she would have the substantial resources of J.P. Morgan, including staffing and intellectual capital, available to help her grow her business at a rate faster than was possible at Merrill Lynch.  They assured her of J.P. Morgan's "One Firm" approach—emphasized to Campbell by Kristin Lemkau, CEO of J.P. Morgan Wealth Management (the division in which JPMA sits), and further underscored by Campbell's introduction during the recruiting process to the heads of several business units who would be outside of her direct reporting line, including Frame.  And, crucially for Campbell, J.P. Morgan promised that she would have the freedom to lead her business remotely during the pandemic and that she would not face competition from the Private Bank or other business groups for assets and clients that she herself brought in the door.  Lemkau called and told Campbell how important her move was to J.P. Morgan Chase CEO Jamie Dimon, and she assured Campbell that she would have the support of senior management.

## IV.     J.P. Morgan Formalizes the Terms of Its Employment Offer to Campbell

41.     On June 4, 2020, McCashin emailed Campbell a draft term sheet setting forth the details of her negotiated compensation terms and certain boilerplate terms of her employment, as well as a draft promissory note governing the terms of a seven-figure forgivable loan to Campbell that formed a key component of her compensation.

### A.     Offer Letter Terms

42.     As reflected in the draft offer letter and promissory note, Campbell's compensation terms entitled her to receive: (1) a seven-figure forgivable loan that amortized over ten years; (2) a "draw" paid semi-monthly as advances on her commission-based compensation; (3) contingent unvested restricted

- 14 -

stock units; (4) a special cash payment at the end of each anniversary year if she maintained client AUM at J.P. Morgan equaling at least 20% of the client AUM represented at the time of hire; and (5) a cash award for compensation forfeited when she left Merrill Lynch.

43.   Campbell was also entitled to receive asset-based and production-based performance awards if she reached specified goals set forth in the offer letter.  Campbell's performance targets through the first five years of her contract progressively increased; as a result, her performance awards were dependent on her ability not only to move her prior book of business, but also to continue to grow it, in order for her to realize the full benefits of the contract.  This compensation structure underscored the importance of J.P. Morgan's promise that Campbell would not face internal competition for her clients and their business.

44.   The draft offer letter also included a binding arbitration agreement covering "all legally protected employment-related claims," but specifically excluded "any action seeking only declaratory and/or emergency, temporary or preliminary injunctive relief (including a temporary restraining order) in a court of competent jurisdiction in accordance with applicable law," so long as an employee seeking preliminary injunctive relief submits her underlying claims to arbitration following any ruling by the court on the preliminary relief sought.

**B.    Subsequent Negotiations**

45.   Following receipt of the draft offer letter, Campbell was informed that the terms in that document generally could not be changed as a matter of J.P. Morgan policy.  Instead, Campbell was told that any negotiated modifications or additions to the terms of her employment must be memorialized in a side letter and/or the promissory note, which she was told was standard practice for financial advisors hired by J.P. Morgan and indeed across the entire industry.[12]  Accordingly, Campbell orally agreed in June 2020 that the terms of J.P. Morgan's offer letter were generally acceptable, subject to the receipt of an acceptable side letter signed by J.P. Morgan enumerating the additional conditions of Campbell's employment that were essential to her decision to join J.P. Morgan.  Campbell negotiated those additional

---

[12] Campbell was not represented by counsel in her contract negotiations with J.P. Morgan.  She negotiated terms with McCashin based on her prior contract at Merrill Lynch put together by her lawyer at that time.

terms directly with McCashin, who sent Campbell an email on September 23, 2020, setting forth "a draft of the Memo of Understanding we discussed to cover open items and link the two documents."

46.     The draft "Memo of Understanding," provided by McCashin, memorialized the special protections that J.P. Morgan promised Campbell during negotiations, including the promise that the Private Bank would not compete with Campbell for her clients or seek to expand the nature of the Private Bank's relationship with her clients at Campbell's expense:

- **Shared Clients**: "As discussed with David Frame, head of the Private Bank in July 2019, clients that [Campbell] currently share[s] with J.P. Morgan Private Bank will not result in forced partnering or forced consolidation," and the "stated approach is for those client(s) ***to maintain the current nature of their relationship with the Private Bank*** and transition assets currently held with [Campbell at Merrill Lynch] to J.P. Morgan Securities under [Campbell's] care" (emphasis added).

- **Good Partners**: "Both sides agree to be good partners and look for ways to collaborate going forward while maintaining separate coverage for the client(s)."

- **Work From Home**: "[J.P. Morgan] acknowledge[s] [Campbell's] need to have a work from home arrangement for the duration of the pandemic."

47.     Despite McCashin's earlier resistance to modifying the boilerplate terms of the offer letter, his September 23, 2020 email also memorialized that J.P. Morgan and Campbell had agreed to two specific modifications of the offer letter and promissory note (namely, the definition of "Active Employee" that would govern in Campbell's contract and language relating to termination for cause in the promissory note).  These modifications were separate and apart from the list of "open items" relating to the offer letter and promissory note that were set forth only in the draft Memo of Understanding.  McCashin therefore attached revised versions of the offer letter and promissory note dated September 17, 2020, and September 2, 2020, respectively (the "Offer Letter" and "Promissory Note") reflecting those modifications. Campbell orally accepted the Offer Letter as modified and subject to the forthcoming side letter, and told McCashin she would sign the Offer Letter as soon as she resigned from Merrill Lynch and joined JPMA. In turn, McCashin agreed to make arrangements for the execution copy of the Offer Letter and Promissory Note to be ready for her signature when she joined the firm.

48.     McCashin subsequently sent Campbell the promised "side letter" on October 16, 2020 finalizing the "mutual agreements [the parties] have made in conjunction with [Campbell] joining the San Francisco office of J.P. Morgan Securities on or around October 19, 2020" (the "Side Letter").  The Side Letter—signed only by McCashin, who informed Campbell that it had been approved by Harvey—

- 16 -

reflected each of the key agreed-upon terms that were first memorialized in the Memo of Understanding, including a specific reference to the fact that the parties had modified J.P. Morgan's boilerplate Offer Letter.  Consistent with McCashin's statement on September 23 that the additional terms were intended to fill in "open items" in the Offer Letter and Promissory Note that were "link[ed]" thereto, the Side Letter directed Campbell to "refer to your offer letter for any matters not referenced" in the Side Letter.

**V.    Campbell Agrees to Bring Her Book of Business to J.P. Morgan and Executes an Offer Letter and Side Letter Setting Out the Terms of Her Employment**

49.    Following the parties' agreement to the terms of the Offer Letter, the Promissory Note, and the additional J.P. Morgan commitments memorialized in the Side Letter, Campbell reaffirmed that she was prepared to sign the Offer Letter and Promissory Note as modified by the Side Letter as soon as she resigned from Merrill Lynch.

50.    What followed was a comedy of errors by J.P. Morgan's onboarding staff.  Pursuant to regulatory requirements, Campbell could not actually sign the Offer Letter with J.P. Morgan and be employed there until she had resigned her employment at Merrill Lynch.  She commenced employment as a Managing Director at J.P. Morgan on October 21, 2020, and J.P. Morgan funded her forgivable loan pursuant to the Promissory Note on that same day.  But the Offer Letter Campbell was presented with upon resigning from Merrill Lynch and joining J.P. Morgan was riddled with errors, including an incorrect July 2020 start date for Campbell's employment.  J.P. Morgan subsequently re-issued the Offer Letter to Campbell on October 27, 2020—substantively identical to the earlier Offer Letter—which Campbell executed on November 3, 2020, the date she also signed a reissued copy of the Promissory Note memorializing the forgivable loan portion of her compensation.  Even the Offer Letter that Campbell signed reflects clear drafting mistakes—for example, on one page, it states that "[w]e expect you to start October 12th 2020" (probably a typo transposing the numbers of her October 21 start date), but a later page in the same document states "[y]our employment with JPMS will commence at a mutually agreeable time expected to be on or about July 13th 2020."  Moreover, even after Campbell signed the Offer Letter, she was informed that it was somehow invalid because it had not been notarized; a notarized offer letter was not executed until more than eight months after she began her employment at J.P. Morgan.  Adding to the confusion, she was told that the terms of her forgivable loan were based on a July 2020 start date at

- 17 -

J.P. Morgan—even though she was still employed by Merrill Lynch in July and the loan was not funded until October 2020.

51.     Despite these repeated failures by J.P. Morgan to execute the basic functions of onboarding a new employee, the parties' intention was crystal clear: the terms of Campbell's employment were governed by the agreements set forth in the Offer Letter and the Promissory Note as modified by the Side Letter.  This mutual intent is underscored by the fact that the Offer Letter and Promissory Note both reflect the negotiated and agreed-upon language revisions that were specifically noted in the later-agreed-upon Side Letter.

## VI.   J.P. Morgan Breaches Its Contractual Obligations and Applicable Laws by Poaching Campbell's Clients, Defaming Her, Interfering with Her Business, and Preventing Her from Accessing Firm Systems Essential to Her Business

52.     Campbell debuted at J.P. Morgan to great fanfare.  She was featured on J.P. Morgan's homepage, and business publications including *Barron's* and the *Wall Street Journal* trumpeted that Campbell's "$1.1 Billion Merrill Lynch Team Jumps to J.P. Morgan Securities,"[13] giving J.P. Morgan "one of Merrill Lynch's most successful brokers."[14]   A billionaire client of Campbell's emailed Jamie Dimon to congratulate him on the hire of Campbell and sing her praises, and Dimon personally called Campbell to welcome her to the company.

53.     J.P. Morgan immediately reaped benefits from bringing Campbell aboard.  Nearly all of Campbell's clients followed, amounting to $1.1 billion of assets and $270 million of loans.  This was remarkable to senior management at J.P. Morgan.  Lemkau told Campbell that she had brought in more assets in a week than all other advisors combined.  Campbell performed so well that she hit the targets to earn the back-end bonus specified in the Offer Letter.  For its part, J.P. Morgan has performed several of its obligations pursuant to the Offer Letter, Promissory Note, and Side Letter, including funding a significant loan to Campbell that is forgiven over time as part of her compensation, providing Campbell's

---

[13] Ross Snel, *$1.1 Billion Merrill Lynch Team Jumps to J.P. Morgan Securities*, BARRON'S (Oct. 21, 2020, 12:06 PM), https://www.barrons.com/articles/1-1-billion-merrill-lynch-team-jumps-to-j-p-morgan-securities-51603296386.

[14] *J.P. Morgan Hires Top Merrill Private Advisor in San Francisco*, ADVISORHUB (Oct. 21, 2020), https://advisorhub.com/j-p-morgan-hires-top-merrill-private-advisor-in-san-francisco/.

team with access to a Bloomberg terminal, and providing Campbell marketing support and a travel and expense budget.

54.     However, despite Campbell's success, things started to take a turn for the worse once her clients were in the door.  It has now come to light that the Private Bank has been taking, and is continuing to take, concerted steps to disparage Campbell, poach her clients and siphon assets into new accounts held in the Private Bank, inhibiting the growth of Campbell's business and her ability to hit future compensation targets, in flagrant violation of the Offer Letter and Side Letter.  These actions reveal the rank falsity of the promises J.P. Morgan made to entice Campbell to join in the first place.

55.     Unbeknownst to Campbell at the time she agreed to join the firm, J.P. Morgan has a history of hiring advisors with significant books of business, only for the Private Bank to attempt to poach their most high-profile and high-net-worth clients and move their assets to the Private Bank.  Recently, Campbell was called by another leading female JPMA financial advisor, who told her of the rampant pattern of poaching financial advisors' clients, referring to herself as "the [involuntary] cold-calling arm" of the Private Bank.  This female advisor said she felt trapped and, as a breadwinner for her children, forced to remain silent, but she begged Campbell to sue the firm and take her deposition under oath.  She also told Campbell of other financial advisors who had been driven out of JPMA by the abusive treatment and competition from the Private Bank.  Another JPMA financial advisor informed Campbell that his clients were approached by Private Bank employees who pitched services offered by the "23 Wall" division of the Private Bank, under the guise that these JPMA clients were being served by the wrong business at J.P. Morgan and needed to transfer their assets to the Private Bank.

56.     When Campbell first complained to her senior managers that the Private Bank was soliciting her clients and disparaging her, the immediate reaction was not shock.  Instead, they simply acknowledged that this internal competition for clients was par for the course at J.P. Morgan.  Indeed, McCashin said it was "right out of their playbook" at the Private Bank.  Again and again, when Campbell went to McCashin with her concerns regarding the Private Bank's misconduct, he gave her the same answer.  The "Playbook" included soliciting clients with loans (often at lower rates to undercut JPMA advisors) and private investments, and denigrating the advisor.  When Campbell asked about escalating this issue to the firm's senior leadership, she was told by McCashin that Sieg (JPMA's CEO) and Lemkau

did not want to risk the political fight.  McCashin pointed out that Erdoes, the powerful longtime CEO of J.P. Morgan's Asset & Wealth Management division (which houses the Private Bank), had survived the firm's scandals concerning former clients Jeffrey Epstein and Bernie Madoff.  McCashin said that Erdoes was simply too powerful, and the plan for JPMA was to try to survive until she was gone.

57.     In moving to J.P. Morgan, Campbell had agreed to a compensation structure in which she risked a pay cut, betting on her ability to bring substantial business to J.P. Morgan and grow it—and she has delivered to a degree that entitles her to earn even greater compensation than she earned at Merrill Lynch.  But Campbell's earning power has been, and will continue to be, damaged by the efforts of the Private Bank to poach clients and their assets from under her care, to diminish her goodwill with clients, and to compete against her in a manner explicitly prohibited in her Side Letter.

58.     In Campbell's experience, the Private Bank's Playbook started with secretive, competitive solicitations that disparaged her to her clients.  It continued with the Private Bank setting roadblocks to prevent Campbell from executing for her clients, while making the Private Bank look indispensable when it swooped in to offer transactions to her clients behind her back.  Recently, it has escalated with forcible partnering and pilfering of assets from client accounts under Campbell's care.  Campbell has only learned of this misconduct from clients who are close enough with her to tell her that her own firm is demeaning her and undermining her from within.

**A.     The Private Bank Engages in a Secretive Campaign to Solicit Campbell's Most High-Profile Client and Siphon Off His Assets in Breach of Its Agreement with Campbell**

59.     One way the Private Bank tries to acquire clients is through a practice of paying high-profile individuals substantial speaking or appearance fees and requiring them, as a condition of the engagement, to open accounts in the Private Bank to deposit those fees.  By doing so, the Private Bank is able to create the appearance that the firm has a meaningful client relationship with these famous individuals.  For example, in the case of Campbell's most high-profile client, a former professional athlete (hereafter, "Pro Athlete Client"), J.P. Morgan paid him handsome fees for speaking at firm events but required Pro Athlete Client to open an account at the Private Bank and deposit the fees in that account.  J.P. Morgan leverages these superficial "client" relationships to entice other similarly situated, high-profile individuals to bank with and borrow from them.  Within the firm, the Private Bank uses this

approach to create "shared clients" with financial advisors and cannibalize financial advisors' long-standing relationships—and the assets that they manage.

### 1.    Pro Athlete Client Follows Campbell to J.P. Morgan

60.    J.P. Morgan first acquired a "client" relationship with Pro Athlete Client by paying him to speak and appear at various events sponsored by J.P. Morgan, including a conference hosted by the Private Bank.  J.P. Morgan also sponsored a Super Bowl party at Pro Athlete Client's home in 2020 and invited Private Bank clients to attend.  Pro Athlete Client invited Campbell, even though she was still working at Merrill Lynch, in recognition of their close relationship.  Campbell was first introduced to Pro Athlete Client through one of his friends, who had been Campbell's client for many years.  Through hard work, Campbell built a relationship of trust with Pro Athlete Client as well, ultimately coming to manage the vast majority of his significant assets.

61.    J.P. Morgan was well aware before hiring Campbell that she was Pro Athlete Client's primary financial advisor. Indeed, at the Super Bowl party, Pro Athlete Client introduced Campbell to Mary Erdoes.  Pro Athlete Client had already explained the nature of his relationship with Campbell to Erdoes.  Erdoes told Campbell at the party how much Pro Athlete Client said he respected Campbell and that she knew Campbell managed all of his assets.  Indeed, Campbell was the only financial advisor from another firm invited to this J.P. Morgan Private Bank event.  Later, Pro Athlete Client told Campbell of J.P. Morgan's repeated but unsuccessful attempts to lure him to do business with the Private Bank.

62.    During the same party, Erdoes privately encouraged Campbell to join J.P. Morgan, and Campbell understood that Erdoes did so in part because she believed Campbell was likely to bring her relationship with Pro Athlete Client to J.P. Morgan with her—a relationship that J.P. Morgan coveted. Prior to Campbell's arrival at J.P. Morgan in October 2020, the Private Bank held a low-seven-figure amount for Pro Athlete Client in an account at the Private Bank.  Harvey (then-CEO of JPMA) admitted to Campbell that the only reason J.P. Morgan held any assets for Pro Athlete Client at all was because the Private Bank had paid him the appearance fees and then deposited them in a newly created Private Bank account for him.  Because Campbell was Pro Athlete Client's primary advisor, he had granted her online authorization to view the account while she was still working at Merrill Lynch, an arrangement approved by J.P. Morgan.  He also asked Campbell to have a call with the Private Bank team so he would feel

comfortable with what they were doing with his funds.  Prior to Campbell's arrival at JPMA, Pro Athlete Client had also once engaged J.P. Morgan to advise him in a business transaction that never materialized.

63.    When Campbell moved from Merrill Lynch to J.P. Morgan, Pro Athlete Client and his partner agreed to move a combined total of hundreds of millions of dollars in assets and debt to J.P. Morgan.  Because the Private Bank held the speaking and appearance fees for Pro Athlete Client, he was deemed to be a client "shared" by Campbell and the Private Bank.  As set out above, under the "Shared Clients" provision of the Side Letter, the "stated approach" that J.P. Morgan promised to abide by was "to maintain the current nature of [Pro Athlete Client's] relationship with the Private Bank and transition assets currently held with [Campbell] to J.P. Morgan Securities under [Campbell's] care."  There would be no "forced partnering or forced consolidation," and the Private Bank and Campbell would be "good partners . . . while maintaining separate coverage" for Pro Athlete Client.  Importantly, at no time prior to Campbell joining J.P. Morgan did the Private Bank have any lending or money management relationship with Pro Athlete Client beyond the relatively tiny speaking fees.  Campbell negotiated the language of the Side Letter provision and used the word "maintain" to ensure that the Private Bank could not use her move to JPMA as an opportunity to expand or change the nature of the limited relationships it had with a handful of her high-profile clients.

## 2.    The Private Bank Begins Secretly Soliciting Pro Athlete Client

64.    In December 2020, shortly after Campbell's move to J.P. Morgan and while Campbell was in the midst of moving her client's assets from Merrill Lynch and completing the underwriting processes for two eight-figure loans, the Private Bank began a secretive campaign of encroachment on Campbell's relationship with Pro Athlete Client.  On December 15, 2020, for example, the Private Bank emailed Pro Athlete Client a pitch book and offered services for which Campbell was already responsible, including private equity deals offered by the firm.  Campbell was not even copied on this communication.  Pro Athlete Client discussed the Private Bank's outreach with Campbell and told her he was surprised by the high-pressure approach, exposing a divided firm in which separate divisions competed and failed to communicate with one another.

65.    Though Pro Athlete Client had already made his choice clear by placing nearly all of his assets under Campbell's care, he was happy to put his intentions expressly in writing.  On December 19,

2020, he emailed Campbell to clarify J.P. Morgan's management of his assets and business, explicitly placing her in charge of all aspects of the client relationship:

> Going forward, I would like Gwen Campbell to captain the relationship at JPM including my personal wealth and our corporate entities, and including investing in private and public investments, planning and raising capital. This would include any new assets coming into JPM and coordinating with Patrick McGoldrick on special investments[.] I'm happy to leave my prior assets with which is about $1.7 mil cash with the [William] Sinclair team [at the Private Bank]. Any new cash or investments above this, including Wish [Foundation] proceeds, should be routed to Gwen Campbell.

66.     Pro Athlete Client's request was also consistent with J.P. Morgan's contractual promise to ensure "separate coverage" and to "maintain" the "current nature of [his] relationship with the Private Bank" and "transition" all other assets from Merrill Lynch to J.P. Morgan under Campbell's care.

67.     Campbell forwarded Pro Athlete Client's December 19 email to McCashin and copied him on her reply to Pro Athlete Client. McCashin, in turn, warned Campbell that the Private Bank would likely continue to use any assets under its control—even a tiny fraction of Pro Athlete Client's total assets—as an excuse to solicit him. After Campbell conveyed this news to him, Pro Athlete Client requested that the Private Bank move even the speaking and appearance fees over to accounts under Campbell's management.

68.     The attacks from the Private Bank expanded to affect multiple clients, and Campbell asked McCashin what to do. McCashin instructed her to ask Lemkau to bring this to the "conflicts committee." Campbell forwarded Lemkau a review of the Private Bank actions to solicit several clients and included Pro Athlete Client's request. In emails sent on January 15 and January 19, 2021, Lemkau acknowledged the need to insert herself into the "[Pro Athlete Client] issue" and to tell the Private Bank to "stand down," confirming that she was "on it." Both McCashin and Lemkau were aware of the express terms of Campbell's Side Letter; indeed, McCashin signed it. At that time, Campbell trusted that her senior management would ensure that the firm abided by the terms of her Side Letter because of Lemkau's response, the escalation to senior management, and Pro Athlete Client's explicit request for Campbell.

69.     The Private Bank, however, continued its aggressive efforts to poach Pro Athlete Client, in contravention of the Side Letter and the client's express written wishes. In mid-February 2021,

Campbell closed the eight-figure unsecured loan she had been arranging for Pro Athlete Client, on top of the existing secured line of credit she had previously closed.

70.     Campbell had performed what J.P. Morgan had asked her to do.  She moved Pro Athlete Client's assets to J.P. Morgan away from a competitor, thus achieving what J.P. Morgan had been unable to do through years of solicitations, parties, and speaking fees.  Campbell brought in and closed lending business with Pro Athlete Client, and she brought in substantially all of the client's assets and the assets of his high-profile partner.  She demonstrated by any measure that she was capable and had the client's trust, his assets, and the loan, but this did not earn her the respect of her new colleagues at J.P. Morgan. Instead, it incited an all-out attack on Campbell by the Private Bank.  At every other firm where Campbell had worked, when a client makes a choice and places his or her trust in an advisor, this choice is respected as a boundary within the firm.  But at J.P. Morgan, neither the client's choice nor Campbell's work was respected.

71.     Within 10 days of closing the loan, Pro Client Athlete called her and reported that he had been subjected to high-pressure sales tactics from the Private Bank.  Vince La Padula, the Global Head of Lending, Deposits, and Custody at the Private Bank, called Pro Athlete Client to try to persuade him to move his assets away from Campbell and to the Private Bank, telling him that he should "drop Campbell" and work with the Private Bank directly.  Specifically, La Padula told Pro Athlete Client that the Private Bank could easily secure an additional eight-figure loan and, La Padula promised, on more favorable terms—but *only* if he moved his assets away from Campbell's care at JPMA to the Private Bank, to the same private banker he had already fired.

72.     Pro Athlete Client was upset by these back-channel efforts.  He called Campbell who, in turn, escalated the issue to both McCashin and Lemkau, seeking assurances that her contract would be honored.  Pro Athlete Client wanted to know why two divisions within the firm were competing with one another, particularly when he had just explicitly stated his desire to remain with Campbell and had just moved all of his assets with her.  He was confused as to why J.P. Morgan would not be supportive of her, with whom he had a long-standing relationship.  He told Campbell that she looked out for his best interests and that he wanted to stay with her.  While on the phone with Pro Athlete Client, Campbell relayed his concerns by email to McCashin and Lemkau in real time.

### 3.        La Padula Escalates His Improper Conduct

73.        On February 19, 2021, Lemkau emailed Campbell and included a message from David Frame, CEO of the Private Bank: "The [Private Bank] has sent all the assets to gwen and communicated to [Pro Athlete Client] that gwen will be the quarterback. . . . We have told vince [La Padula] to reach out to gwen so they can work together on it, there should not be a reason the assets need to leave [J.P. Morgan Advisors] (that I am aware of) regardless of anything that [Pro Athlete Client] wants to do."  Lemkau further encouraged Campbell to reach out to La Padula to review Pro Athlete Client's lending needs, assuring Campbell that La Padula "totally understands this is your account."  Following Lemkau's advice, Campbell emailed La Padula later that day to set up a call to discuss additional loans for Pro Athlete Client.

74.        La Padula refused to speak with Campbell, instead directing her to work with a private banker, William Sinclair.[15]  Campbell reported to Lemkau that La Padula was refusing to speak with her; Lemkau, in turn, promised to fix the situation and said that she would contact La Padula's boss to get him on a call.  Only after this intervention did La Padula even agree to speak with Campbell.

75.        On their February 22 call, La Padula berated Campbell, telling her that she should "be nice" and partner up with Sinclair.  He threatened that he had seen these conflicts play out in the past between the Private Bank and JPMA and that Pro Athlete Client would be disadvantaged and have a "bad outcome."  He went on to say that Campbell herself would also have a "bad outcome" at the firm if she tried to do a loan without partnering with Sinclair.  This threat of forced partnering directly violated the terms of her contract, which protect the clients that Campbell brought to J.P. Morgan from forced partnership.  Forced partnership was also contrary to Pro Athlete Client's express wishes.  La Padula further tried to intimidate Campbell by highlighting how senior he was within J.P. Morgan, with hundreds of people working for him, and how he had just spent the morning speaking with an important regulator. He called her a "no one."  Remarkably, La Padula insisted that the Private Bank was "owed" a lending

---

[15] Sinclair had previously been assigned to cultivate a relationship with Pro Athlete Client but had failed to develop any meaningful relationship with him over the prior five years.  Despite having been handed the opportunity to "oversee" the account holding the low-seven-figure speaking and appearance fees for Pro Athlete Client, Sinclair had not originated any loans or other business with Pro Athlete Client prior to Campbell's arrival.

relationship with Pro Athlete Client because a prior attempted deal with him had not worked out.  When Campbell tried to explain that the client wanted her to service his lending needs, La Padula belittled her as being "confused" and told her that one of his junior bankers would explain it to her.

76.     Campbell immediately reported the phone call to her manager McCashin, asking what she should do and whether she should take the issue to the dispute resolution committee.  This relatively new committee—previously touted by Frame and McCashin as an effective means of resolving channel conflicts within the bank—was supposedly responsible for resolving any and all disputes between competing lines of business within J.P. Morgan.  McCashin immediately dismissed the idea, asserting that the committee did not handle channel conflicts involving members of senior management.  Because La Padula was "too senior," "[McCashin's] hands were tied."  McCashin further tried to recharacterize the call as an "HR issue," because La Padula had behaved inappropriately toward Campbell, but he seemed to ignore the serious contract issue.  McCashin suggested that Campbell should escalate the issue herself to Lemkau.

77.     Following McCashin's advice, Campbell then escalated the incident to Lemkau.  Although Lemkau acknowledged the problem, she failed to address La Padula's verbal abuse and eventually stopped responding to Campbell's calls.  Later, in August 2021, Campbell was excluded from Lemkau's visit to meet West Coast JPMA advisors.  Campbell also reported both the Private Bank's solicitation of Pro Athlete Client and the abusive phone call with La Padula to Sieg.  La Padula's behavior went unaddressed.  Months later, at a meeting on October 27, 2021, Sieg admitted that La Padula was a "bad guy" but could not answer why the incident had never been addressed.

78.     Campbell confirmed with the lending specialist on her team, Molly McHugh, that she, like all JPMA financial advisors, indisputably could facilitate exactly the same lending as the Private Bank.  McHugh, who had just led the eight-figure loan for Pro Athlete Client through the underwriting process, also indicated a reason why Pro Athlete Client received the call from La Padula shortly after Campbell's loan closed.  In the J.P. Morgan systems, once Campbell closed the client's loan in mid-February, it

became visible to La Padula—and his solicitation of Pro Athlete Client began immediately thereafter.[16] For the Private Bank, this was a catalyst to solicit Pro Athlete Client and demand that Campbell engage in forced partnerships with the Private Bank.  Once Campbell proved that she could close a loan inside JPMA, the Private Bank called "all hands on deck" to solicit her client and prevent her from closing such loans in the future.

        **4.**        **The Private Bank Continues to Solicit Pro Athlete Client While Frustrating Campbell's Efforts to Respond to His Requests**

79.    After Campbell's disputes with La Padula concerning Pro Athlete Client's loans, Pro Athlete Client suggested that Campbell reach out to Patrick McGoldrick (a Managing Director in the Private Bank) in hopes that he could give her insight into the Private Bank's strategy.  McGoldrick confirmed Campbell's fears that she would likely be stonewalled in her efforts to provide any future lending facilities that Pro Athlete Client desired.  McGoldrick informed Campbell that La Padula was the only person who could close large loans for high-profile clients, and that he could do so simply by waving his "magic wand."  He further confirmed that La Padula did this for other clients with the support of Erdoes, and he had seen it done recently for another family.  This served as confirmation that Campbell's efforts to secure loans for Pro Athlete Client would be frustrated not for any practical reasons, but because the Private Bank leadership was using its political power within J.P. Morgan to ensure that all large loans were routed through the Private Bank.  Moreover, during what was supposed to be a friendly call, McGoldrick kept critical information from Campbell.  He failed to inform Campbell that he was on his way to visit Pro Athlete Client with Erdoes in less than five days.  This reflects a pattern where, time and again, Campbell is excluded from meetings and even denied knowledge of their existence until after they occur, while the Private Bank meets with her clients.

80.    After the in-person meeting with Pro Athlete Client, McGoldrick called Campbell and informed her of the meeting.  He told Campbell that during the meeting with Pro Athlete Client, he and Erdoes solicited further lending business from Pro Athlete Client using detailed information regarding his

---

[16] Campbell learned from another JPMA financial advisor that the Private Bank has access to a database reflecting client relationships and contacts across the firm.  When that advisor discovered that the Private Bank was using the database to solicit her clients, JPMA financial advisors lost access to the database altogether.

assets.  McGoldrick was central to J.P. Morgan's Playbook, in his role as Global Head at the Private Bank's 23 Wall Private Investments division, which the Private Bank used to entice JPMA clients with private deals.

81.     Even so, Pro Athlete Client once again confirmed his desire to work with Campbell.  In late February, Pro Athlete Client contacted Campbell and sought an additional eight-figure borrowing facility to make a time-sensitive investment.  Campbell was assured by George Epstein, Head of Banking and Lending Solutions at J.P. Morgan Wealth Management, that JPMA could make this loan and that the product was the same as what the Private Bank could offer.  While Campbell relayed to Epstein the threats from La Padula concerning lending to Pro Athlete Client, Epstein said he was in close contact with La Padula and reassured Campbell that JPMA could make the loan.

82.     Campbell, however, faced repeated delays and obstacles in the lending process that were caused by J.P. Morgan.  Requests for internal meetings and updates from the J.P. Morgan lending team responsible for helping Campbell put together the loan went ignored.  On March 12, weeks after Pro Athlete Client was originally promised the loan, Campbell emailed Sieg to request his assistance in overcoming the roadblocks in the lending process and pushing Pro Athlete Client's new loan across the finish line.  In the same email, Campbell reiterated her concerns about Erdoes and La Padula's ongoing solicitation of Pro Athlete Client to move his assets to the Private Bank and her repeated, unanswered requests for this backchanneling to stop: "It is not okay to ask me to bring over my clients and then solicit them to leave me and go to the private bank."  Campbell also raised her concerns about La Padula's disparaging behavior: "Vince belittles me when I try to talk to him about the loan. … Why does Vince have a carve out on this behavior?"

83.     Even after Sieg's intervention, however, the lending team continued to drag out the process, harming Pro Athlete Client's financial position and Campbell's relationship with her client.  Despite numerous requests from Campbell and Pro Athlete Client's family office, the lending team refused to provide a written consolidated list of outstanding documents necessary to finalize the line of credit.  Because the loan was not concluded as Pro Athlete Client had requested in a timely fashion, he was forced to sell stock to fund an investment without missing the deadline.  Upon information and belief, La Padula took steps internally to ensure the loan requested by Campbell was delayed indefinitely.  In response to

- 28 -

Campbell's complaints, Sieg and Lemkau counseled patience and promised to make things right for Campbell and her clients.

     **5.**     **The Private Bank Uses the Sports Team Loan to Poach Pro Athlete Client's Assets**

84.     In or around early May 2021, Pro Athlete Client approached Campbell and requested a substantial new loan to fund his purchase of a minority stake in a sports franchise (the "Sports Team Loan"). Campbell promised to pursue the loan on his behalf, conducting an in-depth review of his existing assets and debt obligations. J.P. Morgan, however, soon informed Campbell that the firm was unwilling to modify the terms of his existing loans or extend any additional credit. On May 3, Campbell asked McCashin for final confirmation that the "official answer" from J.P. Morgan on the loan would be "no," noting her concerns that Pro Athlete Client would call the Private Bank if she denied his request. McCashin confirmed that no further lending would be provided.

85.     On May 12, however, Campbell learned from Pro Athlete Client himself that, following her negative response on the Sports Team Loan, the Private Bank had taken the initiative of sending him a term sheet for the loan. The Private Bank excluded Campbell from all communications regarding the Sports Team Loan, and she only learned of the Private Bank's offer from Pro Athlete Client, underscoring that she was kept out of the loop concerning the details of his finances. Not only did no one at the Private Bank communicate with Campbell about her client's position before speaking with him to solicit his business in contravention of the Side Letter, but the Private Bank extended Pro Athlete Client the very loan that was rejected when requested by Campbell. As discussions about the Sports Team Loan moved forward, Campbell was completely sidelined by the Private Bank. She continued to receive some additional details about the loan being offered by the Private Bank from her calls with Pro Athlete Client. From a call with him on May 14, 2021, she learned that he would be working with Scott Milleisen, a Managing Director in the Sports Finance Group at the Private Bank who reported directly to La Padula. To Campbell's knowledge, the Sports Finance Group handled loans that were secured by a sports franchise asset, not loans secured by the client's investment portfolio, like the one requested by Pro Athlete Client. Thus, it was clear to her that by involving the Sports Finance Group, the firm was attempting to create a false rationale for permitting the Private Bank (and not her) to offer the loan to Pro Athlete Client.

86.     Campbell lodged a vociferous complaint regarding the Private Bank's efforts to materially change and expand the nature of its relationship with Pro Athlete Client in violation of the Side Letter and at Campbell's expense.   She escalated her concerns about this new loan and the lack of internal communication to Sieg, McCashin, and Lemkau.   In response, Sieg disclosed that the loan was being directed at the highest levels of J.P. Morgan and the Private Bank's senior leaders and being undertaken against the original judgment of the underwriting team:

> [Pro Athlete Client] definitely reached out to Mary [Erdoes] personally to ask about this loan after deciding to go ahead with the purchase of the [sports team] and dropping is [sic] ownership from [X]% TO [Y]%. That changed the size of the loan needed and Mary asked the underwriting team to lean in and do this after previously deciding not to participate. No Private Banker is involved, this is being done at the Mary and Dave [Frame] level with Vince being directed by Mary.

87.     In response to her protests, Sieg repeatedly requested that Campbell be patient, assuring her that he could "fix" the situation for Campbell.   She understood Sieg to be committed to ensuring that the Side Letter was honored and that she would maintain control over Pro Athlete Client's assets.

88.     During the process of negotiating and underwriting the Sports Team Loan for Pro Athlete Client, the Private Bank increasingly cut Campbell out of the chain of communications.   The team from the Sports Finance Group negotiating the loan regularly excluded Campbell from key calls and meetings, despite having promised to inform her of any new developments regarding the loan before communicating them to Pro Athlete Client.   For example, Jordan Kessler of the Sports Finance Group tried to avoid Campbell by calling more junior members of her team, while Milleisen repeatedly failed to show up on calls with her despite Pro Athlete Client's written requests for him to attend.   When Campbell asked the team to honor their agreement, they claimed not to know about it and then attacked her as being "confused" and "unclear."   During this entire period of time, Campbell continued to press J.P. Morgan senior management to remedy their contractual breach and believed that Sieg was trying to resolve her conflict with the Private Bank and ensure that her Side Letter would be honored.

89.     Campbell believes that Pro Athlete Client's loan for the sports team closed sometime in June 2021.   On information and belief, there was no reason that the Sports Team Loan *had* to be structured by the Private Bank.   Although Pro Athlete Client's loan was used to purchase a share in a sports team, the sports team itself was not made part of the loan's collateral.   Instead, the loan is secured by Pro Athlete

- 30 -

Client's investments in private equity, including investments made with cash under Campbell's management, but without her advice or input. The Private Bank thus used the Sports Team Loan as a ruse to drastically restructure Pro Athlete Client's relationship with J.P. Morgan and position the Private Bank to begin siphoning off assets under Campbell's management.

90.     Despite weeks of requests for the information, Campbell did not know the broad details of the Sports Team Loan, including its terms and conditions, until she finally heard them from Pro Athlete Client's family office. Campbell did not even know the interest rate the Private Bank was charging him until months later. She was still supposed to be the client's "quarterback," but she did not know what rate he was paying or what payments he was obligated to make to the Private Bank. To this day, she has still never seen a copy of the Sports Team Loan agreement. As a result, she remained in the dark about how the loan might affect his assets under her care. Indeed, Campbell was never informed that the loan was secured against assets she arranged or managed for Pro Athlete Client or that the loan agreement gave the Private Bank rights to seize assets from her custody when certain liquidity events occurred. Only very recently has Campbell come to understand that the Sports Team Loan would be used to siphon off assets from her accounts into the Private Bank's accounts, in contravention of the Side Letter's guarantee to "maintain[] separate coverage" and Pro Athlete Client's express, repeated requests for Campbell to "captain the relationship."

### 6.     The Private Bank Consolidates Its Control Over the Poached Pro Athlete Client Relationship, and JPMA Fails to Act

91.     In September 2021, the Private Bank's poaching of Pro Athlete Client significantly increased in scope when it began interfering with Campbell's management of the assets under her care. In early September, Sinclair—the private banker who was previously removed from Pro Athlete Client's account in December 2020—was again added as a part of Pro Athlete Client's coverage team. Campbell emailed both Sieg, now CEO of JPMA, and McCashin. This was explained away as a mere "operational issue" that required a Private Bank employee to be assigned to the loan on the account. Thereafter, Kessler began calling a junior member of Campbell's team, directing him to sell off certain of Pro Athlete Client's stocks and move the proceeds to the Private Bank to support the Sports Team Loan. Faced with this interference, on September 20 Campbell pleaded with Sieg and McCashin for "clarity" on her "role,

- 31 -

partnership, economics and expectations" on Pro Athlete Client's account and lending going forward, believing that they could keep the Private Bank at bay, as they had promised.

92.     Campbell's view into the Private Bank's scheme was hidden because the Private Bank repeatedly excluded her from communications with Pro Athlete Client and refused to provide her with accurate information that she needed to help him comply with the requirements of the Sports Team Loan. This exclusion occurred even after Kessler and the Sports Finance Team agreed, on numerous occasions, to share information and coordinate their outreach with Pro Athlete Client.  For example, the Private Bank refused to share the timing and amount of interest payments due on the Sports Team Loan, hiding information on the loan repayment schedule until the last minute and giving her incorrect numbers. Campbell was then forced to communicate with Pro Athlete Client regarding which assets to sell in order to support the loan using partial or incorrect information, making her look incompetent and unable to meet his needs.

93.     The Private Bank's plan was further obscured because of J.P. Morgan's ongoing denial of adequate remote-work accommodations for Campbell, which denied her ready access to complete information concerning her clients' assets.  As a result, Campbell was forced to work through more junior members of her team, which limited her ability to discover and resist the Private Bank's efforts to appropriate Campbell's business.

94.     On September 22, 2021, McCashin replied to "memorialize [the] conversations" he had had with Sieg and Kessler regarding coverage of Pro Athlete Client's accounts.  He reassured Campbell that she and her team "[are] considered the primary relationship manager for the relationship," implying that the loan and the collateral would be considered under her management for compensation purposes. Moreover, while changing investments would impact the Sports Team Loan's collateral pool and require some communication with Campbell, "[Kessler] and his team are focused solely on the loans related to the purchase of the [sports team]" and "do not want to dictate or propose investment strategy to the client." Finally, McCashin confirmed that the loans, "while not showing [in the firm's systems] under [Campbell's] care, are still being captured by the compensation team[,] and revenue related to those loans will flow through to [her]."  In a separate email, he further indicated that Pro Athlete Client's assets could serve as collateral while remaining in JPMA accounts under Campbell's care and therefore did not have

- 32 -

to be sent to the Private Bank.  These representations by McCashin gave Campbell comfort that the Private Bank would honor the Side Letter guarantee to "maintain[] separate coverage" and to not use the Sports Team Loan to "force[] partnering."  Campbell was temporarily reassured that her assets under management were not being reassigned to the Private Bank.

95.     McCashin's assurances, however, proved to be empty.  Days later, in late September and early October, Campbell learned that all of Pro Athlete Client's newly-public shares would not be returned to accounts under her care, even though she had used cash from those accounts to fund these assets.  Instead, they would be held in new accounts at the Private Bank as collateral for the Sports Team Loan, where they would be sold off (without her advice or expertise) to make payments on the loan.  The Private Bank's newly asserted responsibilities—managing and trading stocks for Pro Client Athlete after removing them from under Campbell's care—marked a dramatic expansion of its role, far beyond the strict lending-only relationship between the Private Bank and Pro Athlete Client repeatedly promised to Campbell in relation to the Sports Team Loan.  Only later, in early November, would Campbell learn that the Private Bank had planned for months to use the Sports Team Loan to take over the trading of Pro Athlete Client's assets.  Again, this siphoning-off was completely unnecessary: the Private Bank can and does accept collateral held in JPMA accounts for other loans.  But the Private Bank's insistence on drafting terms into the loan agreement that allow them to take Pro Athlete Client's assets out from Campbell's accounts is revealing: the Sports Team Loan was a ploy not just to undercut and deny her in lending, but also to drain assets out from under her care.  The proceeds from the liquidity events in these shares would have otherwise gone back into accounts managed by Campbell.  As a result, the Private Bank's asset movement has directly diminished—and will continue to diminish—her assets under management.

96.     Campbell again complained about the movement of assets to McCashin and Sieg.  In October, McCashin said he was working on a solution where the Private Bank could leave the assets in the JPMA accounts.  Campbell relied on this assurance.

97.     The Private Bank's growing control over Pro Athlete Client was further demonstrated when he requested a mortgage for an apartment purchase in late October.  Mortgages are a product that Campbell is readily able to provide.  But according to Pro Athlete Client, La Padula was "driving the lending" and was the only person who could give him the release to make the purchase.  When Campbell

- 33 -

asked for a basic quote, her request to the mortgage team was completely ignored because, reportedly, the mortgage could only be arranged "with senior" members of the firm.

98.     The Private Bank's movement and trading of Pro Athlete Client's stocks continued throughout October, during which time she continued to be excluded from communications with the client and from key information regarding his assets.  Now alarmed by the deteriorating situation and unfulfilled promises, Campbell renewed her concerns to Sieg on October 21, 2021, relying on his repeated statements that he was committed to ensuring that the Private Bank honored the terms of her contract.  Sieg offered to meet with Campbell in person on October 27, "devoting that day to trying to help [her]."  On October 27, however, at a meeting over lunch, it became clear that Sieg would no longer commit to ensuring that the Private Bank left Pro Athlete Client's assets untouched.  Sieg spent most of the meeting directing the conversation to pleasantries and non-substantive topics.  Campbell raised her previous concerns, indicating that matters had escalated.  She asked Sieg, "What am I supposed to do?"  Instead of answering, he abruptly cut the meeting short without providing any sort of solution.

99.     On October 27, the same day Campbell met with Sieg, she finally learned her compensation for the Sports Team Loan.  For the loan, Campbell was repeatedly told to "wait and see" what revenues would "show up"—despite California law requiring employers to inform employees in writing of the methodology by which commissions payments are computed and paid.  *See* Cal. Lab. Code § 2751(a).  Campbell received an email from McCashin informing her that she would receive just ten basis points on the face amount of the loan as compensation, despite bringing in the client and the loan.  Ordinarily, a financial advisor like Campbell is paid a percentage of revenue a firm earns on a loan originated by that financial advisor—sometimes as much as 50%.  On information and belief, the Private Bank is earning nearly 50 times what Campbell is being paid in annual interest on the loan to Pro Athlete Client.

100.     The Private Bank's scheme continues to harm Pro Athlete Client and cause chaos internally, with the full ramifications of its secretive actions only very recently coming to light: Campbell no longer has the ability to execute her client's wishes as directed.  On November 5, 2021, Pro Athlete Client contacted Campbell to ask that she sell stock so that the proceeds could be used to pay down the Sports Team Loan.  The stock in question represented a meaningful investment position for the client and

was illiquid.  Thus, the manner in which the trades were executed was important to Pro Athlete Client.  Campbell had extensive background in trading and specifically in trading for this client.

101.    Campbell scrambled to arrange Pro Athlete Client's trade in accordance with his wishes, but J.P. Morgan denied her even the name of the trader to call to place the order, even when she directly emailed and asked.  With only about two hours left in the day, every lost moment was time that the client was not participating in the market as he directed.  But Kessler from the Sports Finance Group would only tell Campbell that an unnamed team in New York was "handling" the trade.  Now Campbell had a live order and no one to call.  When the Private Bank finally provided the name of its associate who was entering the trade, that trader claimed that Campbell was not authorized to enter the order—because the stock in question had been moved to the Private Bank.

102.    When Campbell raised this urgent debacle to McCashin, he said this was "Exhibit A" as to why Pro Athlete Client's stock should be in Campbell's accounts.  He said it was clear that the client relied on Campbell to make decisions about the management of his equities.  But because the stock had been moved to the Private Bank, Sieg told Campbell in an email that the call was no longer Campbell's to make, instead it was "the Private Bank's call."  While Pro Athlete Client's family office has informed Campbell that there are more stock trades to come that they will want her to handle in the future, the Private Bank's conduct demonstrates that she will continue to be thwarted in executing for her client, increasing the harm to her client relationships and reputation.

103.    After numerous broken promises by McCashin and Sieg that J.P. Morgan would honor her contract, and with no expected help coming from them in the future, the writing is now on the wall.  With assets under her care being vacuumed out, and simple lending like a mortgage being run by senior private bankers, the Private Bank has drastically and detrimentally altered her relationship with Pro Athlete Client.  This is not the "separate coverage" that Campbell was guaranteed in her contract and that enticed her to join J.P. Morgan in the first place.

**B.      Other Campbell Clients Are at Risk**

104.    Campbell's other clients are vulnerable to the same tactics J.P. Morgan has used with Pro Athlete Client: secretive solicitation; defaming Campbell; undermining Campbell's ability to serve her clients' financial needs; and surreptitious pilfering of assets.  While the Private Bank's main target thus

far has been Pro Athlete Client, he has not been the only high-net-worth mark in Campbell's book of business. The Private Bank's conduct towards Campbell's other high-net-worth clients reflects serious ongoing harm to her reputation and client goodwill.

**1.    The Private Bank Poaches Assets from Another Client and Disparages Campbell**

105.    Campbell's second-largest client at J.P. Morgan is the family trust of a billionaire private equity firm founder ("PE Family Trust"). Campbell spent many years cultivating her relationship with the individual client. While Campbell was negotiating her move to J.P. Morgan in the summer of 2020, the private equity partner heading the PE Family Trust passed away. After the individual client's death in July, but before Campbell joined J.P. Morgan in October 2020, the PE Family Trust independently opened an account with the Private Bank, making the trust a "shared client" under the terms of the Side Letter. In October 2020, around the time of her move, the Private Bank was already making disparaging and defamatory remarks about Campbell to the PE Family Trust. Specifically, Sean Livingston (then-Executive Director at the Private Bank) made disparaging remarks that he had "never heard of" Campbell and that she was a "nobody" at J.P. Morgan, implying that the PE Family Trust should work primarily with the Private Bank if it wanted the best rates and opportunities. Campbell's long-time contacts at the PE Family Trust were incredulous and conveyed these demeaning comments back to her. Campbell reported Livingston's inappropriate behavior to McCashin, and he said this was right out of the "Playbook." But to Campbell's knowledge, McCashin did nothing in response.

106.    In April 2021, the PE Family Trust approached Campbell and requested an eight-figure loan to pay estate taxes, with the deadline several weeks away. When Campbell was putting together the loan, she discovered that the Private Bank (Livingston) had moved millions of dollars from the J.P. Morgan account under her management to the PE Family Trust's new Private Bank account, without notifying her, let alone asking for her authorization to do so. Upon investigation, Campbell learned that Livingston had been soliciting her client and sold them a short-term mutual fund product that Campbell could have offered. As a result of this poaching, Campbell had insufficient assets under her management to support the full size of the requested loan. Not only did the Private Bank's pilfering of the PE Family Trust's JPMA accounts reduce the size of Campbell's book of business and commission that she could

- 36 -

earn on the loan, but it also jeopardized her ability to deliver for her client as promised and forced her to coordinate with the Private Bank on the loan to meet her client's needs by the tax deadline—directly contrary to the promises made to Campbell that induced her to join J.P. Morgan.

107.    Campbell was upset by this blatant breach of her contract and notified McCashin of the Private Bank's secret transfer.  At the same time, unbeknownst to Campbell, Livingston was pitching the PE Family Trust on a loan, offering it at fifty-percent-higher rate than what Campbell was offering—and had always offered—to the PE Family Trust.  When Livingston found out about her lower rate of LIBOR plus 75 basis points, he turned around and told the PE Family Trust that he was "working on" the lower rate to match Campbell.  Livingston then complained to his management team at the Private Bank about Campbell offering the client better rates, which were the same rates she had offered to all of her key clients, and this dispute (unlike the dispute involving Pro Athlete Client) went to the firm's dispute resolution committee.  Soon afterwards, Campbell learned from McCashin that the dispute committee had decided in her favor, clarified that there would be "[n]o rate competition on pricing," and indicated that the PE Family Trust could set up lines of credit with either the Private Bank or J.P. Morgan at the rate of LIBOR plus 75 basis points.  Separately, McCashin confirmed the improper nature of Livingston's solicitation and transfer from the JPMA account under Campbell's management.  The committee agreed that Livingston's actions were wrong, but nothing was done.  Campbell asked for notes from the committee's meeting but was denied.

108.    A few days later, Livingston unexpectedly asked Campbell to call him, indicating that the purpose of the call was to coordinate on matching her rate of LIBOR plus 75 basis points for the PE Family Trust.  She was surprised because the business issue was already settled.  Campbell spoke with Livingston about the PE Family Trust's loan.  During the call, Livingston berated Campbell for offering the lower rate, notwithstanding the dispute committee's express approval of that rate, demanding to know why the price was so low and repeatedly telling her to price higher.  Livingston was incensed because he had wanted to offer a much higher rate of LIBOR plus 120 basis points to the PE Family Trust—one that was worse for the client but more profitable for the Private Bank—but could no longer do so because of the rate Campbell had offered.  Finally, he threatened that the Private Bank's line of credit might not be ready and approved before the PE Family Trust's tax deadline.

109.     Campbell reported this phone call to McCashin minutes after it ended in two separate emails, detailing Livingston's "inappropriate and misleading" behavior.  She recounted how she had been "called under false pretenses" to discuss pricing and then "berated" by Livingston for offering to the PE Family Trust the same rate that she had always offered.  Campbell also raised her concerns that the Private Bank had "taken assets directly from [her]," which reduced her client AUM.  This, in turn, directly prevented her from completing the requested loan amount and now jeopardized the PE Family Trust's ability to meet its tax obligations on time.  She implored that the firm "put the client first [to] meet their deadline for the [loan]," requesting help to "meet the client's needs" if the Private Bank could not fund in time.

110.     McCashin did not respond to her emails, and Livingston faced no consequences for his actions.  Ultimately, Campbell was forced to partner with the Private Bank to complete the loan—again, only because it had pilfered the PE Family Trust assets under her care, preventing her from supporting the full loan amount—and it was split between the Private Bank and JPMA, in violation of her contract.  Her requests that the Private Bank return the millions in assets Livingston had taken back to the PE Family Trust account that she managed were not honored until Livingston left the firm.

111.     The Private Bank also refused to give up the PE Family Trust relationship without a fight, contrary to the client's wishes.  On June 9, 2021, after Livingston's departure from J.P. Morgan the previous month, the PE Family Trust requested that J.P. Morgan "move all accounts, assets, and loans [from the Private Bank] . . . to Gwen Campbell," confirming that it was "consolidating [its] full relation-ship with [Campbell]."  Despite the Trust's explicit instructions to "move forward without any delays to make this change," J.P. Morgan dragged its feet for months on fully transferring the accounts from the Private Bank to under Campbell's care.  Even after all this, the PE Family Trust has informed Campbell that the Private Bank continues to solicit the Trust for new business.

112.     Again, the Private Bank's Playbook was clear: first, its executives demeaned and defamed Campbell to her clients, and next, it moved to secretly offer them transactions behind her back or transfer their assets outright from Campbell's management, despite their clear contractual obligations and promises not to do so.  Despite the fact that the disputes committee determined that the Private Bank had

acted improperly, no steps were taken to ensure Livingston or others at the Private Bank to ensure that the misconduct is not ongoing or will not recur.

**2.      The Private Bank Is Also Trying to Poach Campbell's Largest Client**

113.     The Private Bank has also taken steps to groom Campbell's largest client for poaching. That client, a billionaire businessman who is a member of the Forbes 400 list ("Forbes 400 Client"), was also one of her earliest, moving with her throughout her career from Goldman to UBS, then from UBS to Merrill Lynch.  The nature of Campbell's relationship with Forbes 400 Client is public knowledge.  At the time of her move, assets belonging to Forbes 400 Client under Campbell's management were in the hundreds of millions of dollars.  By contrast, J.P. Morgan had historically held assets for Forbes 400 Client valued at less than one-twentieth of that amount.  While the Private Bank won a mandate to manage assets for Forbes 400 Client's foundation in March 2020 by undercutting the rate Campbell offered from Merrill Lynch, assets held by the foundation were considered entirely separate from Forbes 400 Client's personal assets.

114.     Shortly after Campbell's move to J.P. Morgan, Forbes 400 Client emailed Dimon to congratulate J.P. Morgan on the hire.  Because the Private Bank and Campbell both managed assets related to Forbes 400 Client, the relationship was reviewed by J.P. Morgan's conflicts resolution committee on shared relationships when Campbell arrived at JPMA.  In accordance with Forbes 400 Client's express wishes, and as confirmed by the committee, Campbell was to manage all "core" assets held in the Forbes 400 Client and his family's trust and personal accounts, as well as lead future asset diversification efforts. The Private Bank, on the other hand, was to manage only Forbes 400 Client's foundation assets.

115.     Notwithstanding this clear mandate, the Private Bank's backchanneling and soliciting Forbes 400 Client began the very same week that Campbell arrived at J.P. Morgan.  On October 26, 2020, Campbell learned from Forbes 400 Client's family office that the Private Bank had promised that it could do his business "at a fraction of the price."  She immediately raised this reported encroachment to Harvey, then-CEO of JPMA, who expressed surprise that the Private Bank would attempt to compete with her during her first week.

116.     In January 2021, the Private Bank solicited Forbes 400 Client to move his core assets out from under Campbell and misled Forbes 400 Client about the relationship between itself and JPMA.

- 39 -

Among other things, the Private Bank incorrectly told Forbes 400 Client's family office that the same documents used by the Private Bank could be cross-referenced and used by JPMA. When his family office asked Campbell if this was true, she had to inform them that JPMA could not use the signed Private Bank documents but needed different forms for JPMA, which frustrated the client. Moreover, when Campbell's team reached out to the Private Bank to clarify the nature of the documents it had obtained from the client, it received no response.

117. The Private Bank's conduct inevitably took its toll on Campbell's client relationships and goodwill, damaging her reputation as a respected advisor at JPMA who is able to command the resources of the firm to deliver the kind of service that Forbes 400 Client has come to expect. On January 24, 2021, Campbell wrote to Lemkau about her concerns about the "coverage issue" regarding Forbes 400 Client caused by the Private Bank's interference. As noted in her email, the Private Bank's actions not only made Campbell look incompetent but also threatened the decades-long relationship that she had built with her client: "The risk is [Forbes 400 Client] is frustrated by the parallel programs and consolidates with one of us or away from JPM." Lemkau confirmed that she would coordinate with McCashin and the Private Bank to resolve the problem; the issue later was brought before the disputes resolution committee and resolved in Campbell's favor.

118. While J.P. Morgan's handling of this conflict represents a clear acknowledgment of Campbell's contractual rights, it does nothing to demonstrate that the poaching activities of the Private Bank will end. The Forbes 400 Client's foundation still maintains tens of millions of dollars in assets at the Private Bank, presenting an ongoing invitation for it to solicit Forbes 400 Client as it has in the past.

119. Moreover, the Private Bank continues to this day to undermine Campbell's relationship with Forbes 400 Client by depriving her of the lending capabilities that she was promised. In July 2021, Forbes 400 Client requested that Campbell obtain a loan for him, to be secured against his company's stock. Despite the fact that J.P. Morgan underwrote the initial public offering for this stock, the firm has dragged its feet for months on the loan application process, refusing to provide any updates and requesting burdensome paperwork that is typically unnecessary for loan approval.

120. On November 9, 2021, Forbes 400 Client reached out to Campbell concerning the loan, which after months of delay was still not resolved. Campbell, in turn, called the J.P. Morgan investment

- 40 -

banker who had previously worked on the initial public offering for Forbes 400 Client's company. During their conversation, this banker described the ongoing "war" within the firm between the Private Bank and JPMA financial advisors. She alluded to Erdoes and La Padula and the Private Bank's outsized influence in lending across all J.P. Morgan divisions, putting into words what Campbell has recently come to personally experience: she will be blocked from securing loans for her clients unless she partners with the Private Bank. The Private Bank's interference with Campbell's client relationships is doing significant harm, as Campbell's failure to deliver the loan in a timely manner—absent forced partnership with the Private Bank—continues to damage her goodwill and reputation with Forbes 400 Client.

### 3. J.P. Morgan Deprives Campbell of a Loan Opportunity with a Potential New Client

121. Because of the internal "war" between JPMA financial advisors and the Private Bank, Campbell has lost a major new client referred to her by an important existing client. One client Campbell brought over from Merrill Lynch is the Chief Financial Officer of a successful online company transacting in residential real estate ("Real Estate Client"). In or around early June 2021, Real Estate Client referred her boss, who is the co-founder of the company ("Real Estate Co-Founder"), to Campbell for a line of credit. Real Estate Co-Founder held hundreds of millions of dollars in liquid company stock and wanted to obtain an eight-figure loan against that stock. He was ready and willing to move all of his stock to J.P. Morgan in an account under Campbell's care.

122. Throughout early and mid-June, Real Estate Co-Founder provided all the necessary financial information, which Campbell took to the lending team at J.P. Morgan Wealth Management. Based on a timeline received from McCashin, Campbell told Real Estate Co-Founder that the review period would take only "a few days." But weeks dragged by, and J.P. Morgan Wealth Management refused to provide any updates or to approve the loan, despite J.P. Morgan's willingness to extend far riskier loans to other clients. Throughout June and July, Campbell escalated the lack of responses and stonewalling on numerous occasions to McCashin and Sieg, but to no avail. In the end, the client went elsewhere for the transaction. Not only did Campbell lose a potential client with hundreds of millions of dollars in assets, but also the months-long delay and failure to deliver severely damaged her reputation with her referral source. Because she can no longer deliver the services, such as lending, that J.P. Morgan

- 41 -

promised she would have full access to and be able to provide, this referral source has stopped sending new potential clients to her.

**C.     J.P. Morgan Denies Campbell Access to Working Technology Required by Her Contract and California Law, Paralyzing Her Business and Jeopardizing Her Ability to Comply with Her Own Contractual Obligations**

123.    Campbell is immunocompromised and must undergo an intravenous immune globulin transfusion every 28 days.  She is also the only caretaker of a child who is severely immunocompromised and must undergo the same procedure.  Because Campbell's disability and her family's medical conditions were impacted by the COVID-19 pandemic, JPMA agreed that she could work from home for the duration of the pandemic, as reflected in her Side Letter.  Separately, Campbell applied for, and was granted, this accommodation of her disability through J.P. Morgan's customary process under the ADA and FEHA. The most important part of this accommodation was the assurance from JPMA that Campbell would be provided with a home technology arrangement that would give her 24/7 access to the firm's systems, which would allow her to see her clients' accounts and to receive and respond to firm communications.

124.    During her first couple of months at J.P. Morgan, with cases of coronavirus at a manageable level, Campbell was cleared by her doctor to enter the office.  When cases spiked across the country during the fall and winter of 2020, however, she was advised to remain home for her safety and switched to working fully remotely, in accordance with her Side Letter provision.  To work remotely, Campbell must log into J.P. Morgan's virtual private network hosted through WorkSpace, which requires her to input her username, password, and unique "SecurID Passcode" generated by a dual-authentication application on her phone.  As of approximately May 2021, Campbell's connection to J.P. Morgan's systems became entirely unreliable, and she frequently experienced hours-long delays trying to access J.P. Morgan's platforms.

125.    Campbell promptly reached out for help from J.P. Morgan's technology group, and when her problems were not addressed, she escalated to McCashin.  On June 21, 2021, McCashin asked Campbell if she would be interested in receiving an upgrade in home technology that would include the equipment and systems that senior management had, at the time, been using for several months.  Campbell replied minutes later to accept McCashin's offer, noting that she frequently had extreme difficulties logging into the system.

126.     Just a few days later, on June 25, Campbell explained to McCashin in greater detail her inability to access J.P. Morgan's systems and further reiterated the need for a long-term solution.  That afternoon, she had tried but could not log in to authorize client accounts.  J.P. Morgan's IT department did not respond on that day to her request for assistance, nor did anyone on J.P. Morgan's emergency IT call line.  Escalating the problem to McCashin again, Campbell noted that her lack of access and unreliable connection almost always required IT to manually conduct a full profile reset, even though she was using the correct passwords.  She had asked IT to figure out why this was a "repeating issue," but the problems with her profile continued without any permanent solution.  Campbell made clear that the lack of access was not just a minor inconvenience but prevented her from running significant aspects of her business.  These issues continued throughout the following day, June 26, as she worked throughout a weekend to resolve the errors logging into her work profile.

127.     Months later, notwithstanding numerous assurances that the technology would be arriving shortly, Campbell still has not received any technology upgrade as her problems continued.  Campbell has asked McCashin about the timing of the technology upgrade on numerous occasions, including on July 22, August 12, September 19, and October 11.  McCashin, in turn, has confirmed that she would be in the first wave of employees to receive the upgrade, but refused to provide any specific update on its rollout.  Moreover, he and others at J.P. Morgan have failed to work toward any individualized solution for Campbell despite her documented disability, her contractual guarantee of a work from home arrangement, and her repeated requests for basic working equipment.

128.     In the meantime, the technological issues have only worsened, to the point where Campbell now cannot log into J.P. Morgan's systems and has no access to her email except on her mobile device.  After months of issues, Campbell still endured unreliable connections and frequent manual resets of her firm profile.  In or about early October, Campbell lost all access to email for three days, and was thus completely cut off from client communications.  When Campbell notified J.P. Morgan of this outage, they had no explanation for why it had occurred.  Approximately two weeks later, this same issue recurred— again leaving her completely without access to email and with no way to know whether clients were trying to contact her.  She had no knowledge of how long the outage would last.  And recently, because she was unable to log in to J.P. Morgan's systems on her computer, she could not change her password as

- 43 -

periodically required by the firm.  Moreover, this denial of access to J.P. Morgan's systems jeopardizes her ability to comply with her contractual obligations, like completing firm-mandated compliance trainings, upon which part of her compensation is conditioned.

129.    The frequent compliance notices and the loss of email—with no solution in sight—caused Campbell so much stress that she decided to risk her health and the health of her son by traveling to J.P. Morgan's San Francisco office on the weekend to complete her various online compliance assignments. She notified McCashin that because of her lack of remote access, she was forced to physically visit the office, and asked for his help in obtaining cardkey access to the office and ensuring that her computer would be working when she arrived.

130.    On Thursday, October 14, Campbell flew to San Francisco so she could access the JPMA offices to catch up on client accounts and complete some of her compliance assignments.  Her request for cardkey access had been approved, and she was told she would receive a working cardkey via FedEx on Saturday, October 16.  She waited at home for the FedEx to arrive, but the card that arrived was not activated, and there was nobody from J.P. Morgan available on the weekend to assist.  When she contacted McCashin regarding her lack of working cardkey access, he told her that there was no need for her to have cardkey access after all and she could simply ask for a security escort to the floor.

131.    Whenever Campbell's computer access was restored, the fixes were extremely short-lived. On October 15, she was on the phone with the IT department for over an hour, going through numerous reboots and other attempted fixes until she was finally able to log in.  Even then, the IT technician told her she could not change her password or she would risk losing computer access during her visit to the office, where she would be alone on the weekend with no one to help.  On October 20, Campbell once again could not log in to J.P. Morgan's systems at all.  She worked with J.P. Morgan's IT staff, but after dozens of attempts, she still could not log in.  Instead, they had to rebuild her entire profile, use emergency log-in pins, and conduct a manual reset of her computer in the office.  That same day, after Campbell updated McCashin on the latest problems, he informed her that, four months after it was initially promised, the technology upgrade was still perhaps four to six weeks away.

132.    Thereafter, on or about October 27, Campbell made a formal request to McCashin and Sieg that she be excused from further online compliance training and assignments until she is provided with

- 44 -

reliable remote access.  Her managers did not respond to this message, and Campbell has continued to receive notices of compliance violations.

133.    Campbell's efforts to connect to the firm's system have consumed countless hours of valuable time during the workday, and even with temporary fixes from remote IT support, the problems have always recurred.  Despite dozens of requests for assistance and repeated assurances from J.P. Morgan of technological upgrades, Campbell has been effectively locked out of all J.P. Morgan's computer systems since May, except for email on her mobile device, resulting in a near-total paralysis of her business.  Cut off from J.P. Morgan's systems, Campbell cannot respond to clients' requests, coordinate with her team or other divisions within J.P. Morgan, or manage her clients' accounts in a timely manner.  And although J.P. Morgan promised to fix Campbell's technological problems, it refused to provide any workable solution and now turns a blind eye to her requests for assistance.

134.    This denial of an adequate technology setup at home has forced Campbell to access the firm's systems the only way she can: by going into the office outside of business hours.  Although Campbell has a medical need to not enter the office at all given her disability and the condition of her immunocompromised son, she felt that she had to do so once to try to catch up, and hoped J.P. Morgan would respond to her requests for a fix in the meantime.  But the fix has never come.

**VII.    Campbell Will File an Arbitration Demand in the Near Future to Resolve Her Disputes with J.P. Morgan**

135.    Campbell's employment agreement includes an arbitration clause providing that "all legally protected employment-related claims … which arise out of or relate to [Campbell's] employment" "shall be submitted to and resolved by final and binding arbitration."  However, the arbitration clause "does not cover any action seeking only declaratory and/or emergency, temporary or preliminary injunctive relief (including a temporary restraining order) in a court of competent jurisdiction."

136.    Campbell will file an arbitration demand in the near future seeking relief for Defendants' breach of contract, breach of the implied covenant of good faith and fair dealing, fraudulent misrepresentation, defamation, failure to provide written commission schedules in violation of California Labor Code § 2751, gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and FEHA, and failure to provide a reasonable accommodation in violation of the ADA and

- 45 -

FEHA.  Plaintiff filed this action for the limited purpose of seeking injunctive relief against Defendants to preserve the status quo pending the outcome of that arbitration.

**FIRST CAUSE OF ACTION**
**(Injunctive Relief in Aid of Arbitration)**

137.   Plaintiff re-alleges Paragraphs 1 through 136 as though fully set forth herein.

138.   Campbell is entitled to a temporary restraining order and preliminary injunction to preserve the status quo as she proceeds to arbitration of her claims against Defendants.  Campbell is likely to succeed on the merits of her claims in arbitration and, at a minimum, has raised serious questions going to the merits of her claims.  But even if arbitration proceeds expeditiously, it will be months before an arbitrator will be in a position to award relief on Campbell's claims.  In the meantime, Campbell is suffering ongoing and irreparable harm to her business, her client relationships, and her reputation and goodwill.

139.   In addition to substantial monetary harms in excess of $75,000, Defendants' ongoing violations of law are causing, and absent the requested relief will cause, significant harm to Plaintiff's client relationships, goodwill, and reputation, none of which can be fully compensated by monetary damages.  As J.P. Morgan admits in its own standard employment contract, harm to client relationships and reputations is irreparable and cannot be remedied by monetary relief alone.  If Defendants' misconduct is not enjoined in order to maintain the status quo pending the outcome of arbitration, then Plaintiff will therefore suffer significant irreparable harm.

140.   Finally, the balance of the equities and public interest strongly favor injunctive relief because the requested relief will only require Defendants to abide by the terms of J.P. Morgan's agreement with Campbell, whereas the lack of relief will cause substantial ongoing harm to Campbell's business and her ability to work during a global pandemic.

///

///

///

///

///

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief as follows:

*First*, a temporary restraining order and preliminary injunction enjoining Defendants from the following conduct until such time as the parties' rights are resolved in arbitration:

a.   Soliciting, calling, or meeting with Campbell's clients who were not also clients of the Private Bank as of October 2020 on behalf of or for the benefit of the Private Bank without Campbell's agreement, except to the extent required by law;

b.   Seeking to expand the Private Bank's relationship with any Campbell client that was a "shared client" as of October 2020 by offering any product or service that the Private Bank did not already provide such client as of October 2021 without Campbell's agreement;

c.   Transferring any client assets from Campbell's care without Campbell's knowledge and client consent;

d.   Disparaging Campbell when speaking to any clients serviced by Campbell; and

e.   Interfering with Campbell's ability to service her clients by denying Campbell a reasonable work-from-home accommodation.

*Second*, any such other relief as the Court may deem just and proper.

DATED: December 2, 2021                           Respectfully submitted,

CONRAD | METLITZKY | KANE LLP

*/s/ Warren Metlitzky*
WARREN METLITZKY*
WILLIAM J. COOPER

SELENDY & GAY PLLC

*/s/ Jennifer Selendy*
JENNIFER SELENDY (*pro hac vice* forthcoming)
SEAN BALDWIN (*pro hac vice* forthcoming)
MARGARET LARKIN (*pro hac vice* forthcoming)
DAVID COON (*pro hac vice* forthcoming)

*Attorneys for Plaintiff Gwen Campbell*

*In compliance with Civil Local Rule 5-1(h)(3), the filer of this document attests under penalty of perjury that all signatories have concurred in the filing of this document.*

- 47 -